1

2          *E-FILED 2/15/2008*

3

4

5

6

7                    NOT FOR CITATION

8         IN THE UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

11  MICHAEL PEKIN, AMANDA HERNANDEZ       No. C05-05402 HRL
    and PATRICK PEKIN,
12                                         **ORDER GRANTING DEFENDANT'S**
              Plaintiffs,                  **MOTION FOR SUMMARY JUDGMENT**
13      v.

14  COUNTY OF SAN BENITO,                  **[Re: Docket No. 65]**

15            Defendant.
    _____/
16

17      Defendant County of San Benito ("County") moves for summary judgment. Plaintiffs

18  oppose the motion. Upon consideration of the moving and responding papers,[1] as well as the

19  arguments of counsel, this court GRANTS the motion.[2]

20                          **I.  BACKGROUND**

21      This is a civil rights action brought under 42 U.S.C. § 1983. Plaintiffs allege that the

22  County engaged in a campaign of harassment in retaliation for the exercise of their First

23  Amendment rights. Before the court addresses the present motion, it is necessary to set out, in

24  some detail, the events and proceedings which form the background for plaintiffs' allegations.

25

26  _____

27      [1]      The County has asserted a number of evidentiary objections to plaintiffs'
    exhibits and declarations. The court's rulings on these objections are summarized in the
28  addendum to this order.

        [2]      Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have
    expressly consented that all proceedings in this matter may be heard and finally adjudicated
    by the undersigned.

1    For purposes of the instant motion, and except as otherwise indicated, the following facts are

2    not materially disputed.

3    **A.    <u>Factual Background</u>**

4         Plaintiff Michael Pekin is an attorney and a member of the California bar.  Since 2004,

5    he has worked with his son, plaintiff Patrick Pekin, who is also a California attorney.  Plaintiff

6    Amanda Hernandez is now, and since December 2005 has been, a member of the California bar.

7    However, during the time period encompassed by plaintiffs' Second Amended Complaint, she

8    was a law school graduate who worked in Pekin's office as a paralegal.

9         **1.    "Los Valientes"**

10        Since mid-2003, Michael Pekin says that he became concerned about what he perceived

11   to be government corruption in San Benito County – namely, that Richard Scagliotti (then a

12   member of the County Board of Supervisors) used his political office for personal financial gain

13   and to harm his business competitors.  (Michael Pekin Decl., ¶ 2).  Hernandez and Patrick Pekin

14   reportedly shared these concerns and joined in his beliefs and political activities.  (Hernandez

15   Decl., ¶ 4; Patrick Pekin Decl., ¶ 3).

16        Plaintiffs assert that local business people also shared their concerns about corruption in

17   the County government, but feared retaliation if they spoke out.  (Michael Pekin Decl., ¶ 3;

18   Hernandez Decl., ¶ 4; Patrick Pekin Decl., ¶ 4).  Around mid-2003, a self-described "citizen's

19   group fighting corruption" reportedly began meeting secretly to discuss these concerns.

20   (Michael Pekin Decl., ¶ 13).  Michael Pekin claims that, with money contributed by the group,

21   he hired a private investigator, David Henderson, to look into the suspected corruption.

22   Henderson later prepared a report which, Pekin says, confirmed his suspicions.  (Michael Pekin

23   Decl., ¶¶ 4-6, 13).  Plaintiffs further allege that they distributed Henderson's report in order to

24   energize and expand the group.  (Michael Pekin Decl., ¶ 7; *see also* Hernandez Decl., ¶ 4;

25   Patrick Pekin Decl., ¶ 6).

26        Michael Pekin says that, by October 2003, he was convinced that litigation was the only

27   means available to the group to fight the alleged corruption.  (Michael Pekin Decl., ¶ 13).  But

28   reportedly, none of its members were willing to identify themselves in any way in any legal

1   proceeding.  (*Id*.).  Nevertheless, wanting to publicly expose the alleged corruption by

2   Scagliotti, two members of the group (identified only by the pseudonyms "Benito Juarez" and

3   "Pipila Guanajuato Guerrero"), reportedly urged Michael Pekin to file a motion to intervene in

4   a lawsuit then pending against the County in the state Superior Court:  *McGovern v. San Benito*

5   *County*, Case No. CV 03-00103 ("McGovern Action").  Pekin claims that, to protect the

6   identities of the citizens in the group, he dubbed them "Los Valientes" and, on October 14,

7   2003, filed a motion on the group's behalf to intervene in that case.  (*Id*.).

8           **2.      *McGovern v. San Benito County*, Case No. CV 03-00103**

9           In or about 2002, the County Board of Supervisors enacted "Measure G," a land use

10  initiative, as an ordinance.  A citizens' group later qualified a "San Benito Growth Control

11  Initiative" for the March 2004 ballot; and, the County Board of Supervisors agreed to take

12  Measure G to the voters by referendum.  Rebecca McGovern, a County resident, then instituted

13  the McGovern Action by filing a petition for writ of mandate challenging the validity of the

14  referendum.  The lawsuit primarily concerned whether the referendum properly was certified by

15  the Board of Supervisors.  (*See* Severian Decl., Ex. 3).

16          As noted above, in October 2003, Michael Pekin, on behalf of Los Valientes, moved to

17  intervene.  The proposed complaint in intervention alleged that the referendum was illegally

18  adopted in violation of the Brown Act (Cal. Govt. Code §§ 54950, *et seq*.) and also because of

19  alleged acts of corruption by Scagliotti.  (*See* Severian Decl., Ex. 2).  The state court denied the

20  motion to intervene, concluding that "Los Valientes has no particular interest in whether the

21  referendum goes to the voters or not; its interest is in the alleged corruption that led to the

22  adoption of the challenged ordinance."  (*See* Severian Decl., Ex. 3 at 3:16-18).

23          **3.      *Monteon v. Scagliotti*, Case No. CU 03-00150**

24          Shortly afterward, in December 2003, Michael Pekin filed a taxpayer lawsuit on behalf

25  of Juan Monteon against the County and Scagliotti entitled *Monteon v. Scagliotti*, Case No. CU

26  03-00150 ("Monteon Action").  The Monteon complaint contains many of the same allegations

27  of corruption alleged by Los Valientes in the McGovern Action.  (*See* Michael Pekin Decl., ¶

28

14, Ex. 34). (At the parties' last appearance in the instant case, they indicated that the Monteon Action was still pending in the San Benito County Superior Court.)

### 4. *People v. Pekin, et al.*, Case No. CU-04-00156

Approximately one year later, on December 17, 2004, then-District Attorney John Sarsfield filed a civil lawsuit against plaintiffs (as well as Los Valientes, "Benito Juarez" and "Pipila Guanajuato Guerrero") for purported unfair business practices. (Michael Pekin Decl. ¶18, Ex. 42). In essence, the complaint alleged that they engaged in "extortion and conspiracy to bring false law suits [sic], legal actions and other proceedings under the guise of enforcing and exposing alleged state and federal violations of law" through various "schemes." (Michael Pekin Decl. ¶18, Ex. 42 at 4:11-13). The complaint sought injunctive relief and damages against plaintiffs for alleged (a) violations of California Business & Professions Code § 17200 for their activities in connection with the McGovern and Monteon Actions; and (b) interference with the exercise of civil rights. (*See id*. at pp. 6-10).

Plaintiffs subsequently moved to recuse the District Attorney from the case; and, on September 7, 2006, the state court granted that motion. (Michael Pekin Decl. ¶19, Ex. 43). The matter was then transferred to the California Attorney General's Office, which had the lawsuit dismissed without prejudice on January 11, 2007. (*See id*. ¶20, Ex. 44).

### 5. *People v. Pekin*, Case No. CR05-00318

Sarsfield convened a grand jury; and, on February 22, 2005, it returned a multi-count indictment against Michael Pekin for conspiracy to falsely maintain a lawsuit and obstruct justice; preparing false documentary evidence; plus attempted subornation of perjury and deception on the court. (*See* Michael Pekin Decl. ¶17, Ex. 40). These criminal charges apparently grew out of filings and arguments made by plaintiffs in the McGovern and Monteon Actions. (*See id*.).

Michael Pekin moved to set aside the indictment pursuant to California Penal Code § 995. On June 20, 2005, the state court granted that motion and dismissed all charges. The dismissal was affirmed on appeal. (*See id*.).

**6.** *People v. Hernandez,* **Case No. CR-05-00706**

In April 2005, Sarsfield filed a single misdemeanor charge against Hernandez for the unlicensed practice of law. (*See* Hernandez Decl., ¶ 11; Severian Decl. ¶8, Ex. 33). The charges reportedly arose out of Hernandez's activities (e.g., interviewing witnesses and preparing declarations) in the Monteon Action. (*See* Hernandez Decl., ¶ 11). That charge was dismissed by the state court on September 1, 2005. (*Id.*, ¶ 17).

**B.    Procedural History**

The instant lawsuit originally was filed in December 2005 by Michael Pekin and Hernandez based on a claimed First Amendment right to "represent their clients." On the County's Fed. R. Civ. P. 12(b)(6) motion to dismiss, this court concluded that, under liberal federal pleading standards, the complaint sufficiently alleged municipal liability under 42 U.S.C. § 1983. It nevertheless agreed that attorneys have no personal right under the First Amendment to simply "represent their clients," and it followed, neither did paralegals. Accordingly, the complaint was dismissed with leave to amend.

In their First Amended Complaint ("FAC"), Michael Pekin and Hernandez asserted claims for retaliation for the exercise of their First Amendment rights and for conspiracy to deprive them of their constitutional rights under the First, Fourth and Fourteenth Amendments. (A third claim for malicious prosecution was voluntarily withdrawn). In essence, plaintiffs claimed that the civil and criminal proceedings were brought against them in retaliation for their activities and association with Los Valientes.

This court granted in part and denied in part the County's motion to dismiss plaintiffs' FAC. Among other things, the court found that the FAC did not allege any facts demonstrating that plaintiffs were "litigants" in the McGovern or Monteon Actions. Nevertheless, plaintiffs' First Amendment claim survived dismissal insofar as they claimed a violation of their rights to freedom of expression and association. Plaintiffs' conspiracy claim also survived to the extent that it was based upon the alleged deprivation of those First Amendment rights. However, this court dismissed plaintiffs' First Amendment claim insofar as it was based upon an alleged violation of their rights to access or petition. It also dismissed plaintiffs' conspiracy claim to

the extent that it was based upon an alleged violation of their rights under the Fourth and Fourteenth Amendments.

Approximately one year after the instant lawsuit was filed, and pursuant to the parties' stipulation, plaintiffs were given leave to file a Second Amended Complaint ("SAC") adding Patrick Pekin as a plaintiff and asserting claims for (1) retaliation for the exercise of their First Amendment rights pursuant to 42 U.S.C. § 1983 and (2) conspiracy to deprive plaintiffs of their constitutional rights under 42 U.S.C. § 1985(3). However, plaintiffs' request to add current County Supervisor Pat Loe and former County Supervisors Richard Scagliotti, Ruth Kesler and Robert Cruz as defendants was denied.

Pursuant to Fed. R. Civ. P. 56, the County, the sole named defendant in this action, now moves for summary judgment on the ground that plaintiffs have insufficient evidence of a policy or custom – the necessary predicate for municipal liability under 42 U.S.C. § 1983.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See* FED. R. CIV. P. 56(e)(2); *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible

1    evidence that shows there is a genuine issue of material fact for trial. *See id.* A genuine issue

2    of fact is one that could reasonably be resolved in favor of either party. A dispute is "material"

3    only if it could affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at

4    248-49.

5        "When the nonmoving party has the burden of proof at trial, the moving party need only

6    point out 'that there is an absence of evidence to support the nonmoving party's case.'"

7    *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp.,* 477 U.S. at

8    325). Once the moving party meets this burden, the nonmoving party may not rest upon mere

9    allegations or denials, but must present evidence sufficient to demonstrate that there is a

10   genuine issue for trial. *Id.*

11                              **III. DISCUSSION**

12   **A.      Local Government Liability**

13       The County does not, on the instant motion, raise an issue as to whether plaintiffs'

14   constitutional rights were violated. Instead, the only question presently before this court is

15   whether the County, pursuant to an official policy or custom, caused the district attorney to

16   bring civil and criminal actions against plaintiffs because they were lawyers who represented or

17   were affiliated with an anonymous group of local citizens who had accused some members of

18   the Board of Supervisors of corrupt practices. Defendant argues that there is no evidence of the

19   existence of a County policy or custom that caused any deprivation of plaintiffs' constitutional

20   rights.

21       Analysis begins with *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Under

22   *Monell*, local governments are "persons" subject to liability under 42 U.S.C. § 1983 where

23   official policy or custom causes a constitutional tort. *See id.* at 690. However, a city or county

24   may not be held vicariously liable for the unconstitutional acts of its employees under the

25   theory of respondeat superior. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 403

26   (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).

27   "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts

28   of *employees* of the municipality, and thereby make clear that municipal liability is limited to

action for which the municipality is actually responsible." *Pembaur v. City of Cinncinnati*, 475 U.S. 469, 479 (1986).

To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show that: (1) the plaintiff possessed a constitutional right of which he or she was deprived; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Liability based on a municipal policy may be satisfied in one of three ways:

(1) by alleging and showing that a city or county employee committed the alleged constitutional violation under a formal governmental policy or longstanding practice or custom that is the customary operating procedure of the local government entity;

(2) by establishing that the individual who committed the constitutional tort was an official with final policymaking authority and that the challenged action itself was an act of official governmental policy which was the result of a deliberate choice made from among various alternatives, or

(3) by proving that an official with final policymaking authority either delegated policymaking authority to a subordinate or ratified a subordinate's unconstitutional decision or action and the basis for it.

*See Fuller*, 47 F.3d at 1534; *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992), *cert. denied*, 510 U.S. 932 (1993).

**B.    Civil and Criminal Actions Filed by the District Attorney**

Plaintiffs' case is predicated on their contention that the County had a policy of encouraging then-District Attorney Sarsfield to file retaliatory civil and criminal actions against perceived enemies of Supervisor Scagliotti. Preliminarily, the issue to be addressed is whether the County may be held liable by virtue of Sarsfield's prosecution of plaintiffs.

Whether a particular official has final policymaking authority is a question of state law, *see McMillan v. Monroe County*, 520 U.S. 781, 786 (1997), and should be decided as a matter

8

of law by the court.  *See Gillette*, 979 F.2d at 1346-47.  While state law determines the particular character of an official's function, federal law provides the rules of decision on the ultimate question as to whether an official acts for the state or the county.  *See Streit v. County of Los Angeles*, 236 F.3d 552, 560-61 (9th Cir. 2001).

In California, depending on the particular acts or functions being performed, district attorneys may be characterized as either state or county officials.  When deciding whether to criminally prosecute an individual, a district attorney acts as an officer of the state.  *See Weiner v. San Diego County*, 210 F.3d 1025, 1030 (9th Cir. 2000).  Similarly, although the parties have cited no cases as to the role of a district attorney in civil actions, there is some authority indicating that a district attorney also acts as a state, not county, official when prosecuting certain civil actions, including those for alleged violations of California Business & Professions Code section 17200.  *See* CAL. BUS. & PROF. CODE § 17204 ("Actions for any relief pursuant to this chapter shall be prosecuted. . . by any district attorney . . . in the name of the people of the State of California."); *People v. Bhakta*, 135 Cal. App.4th 631, 641, 37 Cal. Rptr.3d 652, 659 (2006) (concluding that Cal. Bus. & Prof. Code §§ 17204 and 17206(a) give city attorneys equal authority with district attorneys to bring actions in the name of the people of the state and to represent the state in such actions); *Nguyen v. Superior Court*, 49 Cal. App.4th 1781, 1789, 57 Cal. Rptr.2d 611, 615 (1996) (concluding that county district attorney acted on behalf of the state when he filed a civil red light abatement action).

Moreover, prosecutors enjoy absolute immunity from liability under section 1983 for conduct that is intimately associated with the judicial phase of the criminal process.  *See Roe v. City & County of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)) ("[p]rosecutors are 'absolutely immune from liability under section 1983 for their conduct in initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'"); *see also Fry v. Melaragno*, 939 F.2d 832, 837 (9th Cir. 1991) (quoting *Butz v. Economu*, 438 U.S. 478, 512 (1978)) ("Whether the government attorney is representing the plaintiff or the defendant, or is conducting a civil trial, criminal prosecution or an agency hearing, absolute immunity is

'necessary to assure that advocates . . . can perform their respective functions without harassment or intimidation.'").

Here, the acts complained of – the decision to convene a grand jury to secure an indictment and the filing of legal actions to prosecute alleged violations of state law on behalf of the people of the state – fall squarely within the district attorney's function as a state, not county, officer. The County therefore cannot be held liable for Sarsfield's conduct in initiating and conducting the civil and criminal prosecutions against plaintiffs.

Plaintiffs maintain that the County nonetheless may be held liable because it had a custom or policy of encouraging, pressuring, or coercing Sarsfield to file retaliatory prosecutions against those who opposed certain members (namely, Scagliotti) of the Board of Supervisors. A showing that the district attorney was pressured or otherwise caused to act contrary to his independent judgment will rebut the presumption that he acted independently. *See Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001) (citing *Smiddy v. Varney*, 665 F.2d 261, 266-67 (9th Cir. 1981)). Here, plaintiffs contend that a County policy or custom of encouraging or coercing the district attorney to file retaliatory prosecutions is evidenced by (a) alleged encouragement and support by (current and former) supervisors and other County employees for the prosecution of plaintiffs; (b) alleged fiscal pressure exerted by the County Board of Supervisors upon the district attorney; and (c) alleged retaliatory conduct by Scagliotti against others. The court now examines each of these in turn.

**C.   Individual County Employees**

The County argues that there is no evidence indicating that it had a policy of pressuring or otherwise causing the district attorney to file retaliatory prosecutions against political foes. Here, it points to Sarsfield's testimony that the decision to file the criminal action against Michael Pekin was his alone. (*See* Severian Decl. ¶3, Ex. 4 (Sarsfield Depo. at 38:5-9, 48:11-13, 78:18-79:3)). Plaintiffs counter that such a policy is evidenced by actions allegedly taken by current and former County employees to encourage the filing of retaliatory lawsuits against them.

### 1. Filing declarations in Sarsfield's civil lawsuit

First, plaintiffs contend that a policy of retaliation may be inferred from the fact that several current and former County supervisors and employees – namely, Richard Scagliotti, Robert Cruz, Ruth Kesler, Pat Loe, Mandy Rose (head of the County's Integrated Waste Management Department) and Robert Mendiola (former County Planning Director) – signed declarations seeking damages in Sarsfield's civil enforcement action. (*See* Severian Decl. ¶¶15-20, Exs. 20-25; Michael Pekin Decl. ¶¶ 21-22, Exs. 45-47). There is no dispute that the declarations were signed by these individuals. However, the County maintains that there is no evidence raising a triable issue as to whether this conduct properly may be attributed to the County.

Municipal liability does not attach unless the decisionmaker has final policymaking authority to establish municipal policy with respect to the action ordered. *See Gilette*, 979 F.2d at 1349 (citing *Pembaur*, 475 U.S. at 481-82). Here, none of the declarants had final policymaking authority as to the filing of the declarations specifically or the lawsuit generally. Indeed, the record indicates that only two of the declarants held County positions at the time the declarations were signed. Scagliotti, Cruz and Kesler executed their declarations in early 2006 – at least a year after they left their respective positions as County supervisors. (Valencia Decl., ¶ 17). Similarly, Mendiola's declaration indicates that he no longer held his position as Planning Director at the time it was signed. (*See* Michael Pekin Decl. ¶22, Ex. 47 (Mendiola Decl., ¶ 1). Supervisor Pat Loe was in office when her declaration was signed; however, individual supervisors do not have final policymaking authority for the County. *See Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 879 (9th Cir. 1988); *see also* CAL. GOVT. CODE § 25005 (the Board of Supervisors may establish official policy by a majority of the supervisors). Nor did Rose have final policymaking authority as to the filing of the declarations or the allegedly retaliatory lawsuits in question. As discussed above, that authority rests with the district attorney.

Further, there is no suggestion that these individuals pressured or otherwise influenced Sarsfield with respect to the filing of the civil action or their declarations. Quite the contrary,

the County's evidence indicates that the declarations were signed at Sarsfield's behest. Indeed, several of the individuals testified that they did not learn that Sarsfield had named them as "victims" and that money was being sought on their behalf until after he filed the lawsuit. (*See* Severian Decl. ¶¶9-11, Ex. 18 (Scagliotti Depo. at 9:13-10:9, 11:15-20, 12:3-10); Ex. 14 (Cruz Depo. at 8:16-10:21); Ex. 19 (Loe Depo. at 12:5-13:10, 20:9-21:8, 25:8-13)). Plaintiffs have presented no evidence to the contrary.

Accordingly, the court concludes that this conduct cannot properly be attributed to the County.

### 2. Other alleged conduct by Scagliotti

Plaintiffs nonetheless maintain that a memorandum, purportedly memorializing a February 5, 2005 interview between the district attorney's investigator and a witness (identified only as "Valles, Jr."), demonstrates that the County engineered the prosecutions against them (or, at the very least, pressured Sarsfield to prosecute them). (*See* Michael Pekin Decl. ¶15, Ex. 35). The memo appears to concern Measure G (the land use initiative) and whether Valles knew anyone belonging to Los Valientes (he did not). Of particular import, plaintiffs claim, is a statement indicating that Scagliotti contacted Valles and asked him to speak with the investigator.

Plaintiffs have not properly authenticated this document. FED.R.EVID. 901. Even assuming that the document is what plaintiffs claim, it does not raise a triable issue as to whether Scagliotti's contact with a witness may be attributed to the County – or, more to the point, that Sarsfield's prosecution of them was rooted in any policy or custom attributable to the County. There is no indication that Scagliotti contacted Valles while he was still in office. Even if he had, as discussed above, individual supervisors do not have final policymaking authority for the County. *See Lake Nacimiento Ranch Co.*, 841 F.2d at 879; *see also* CAL. GOVT. CODE § 25005.

Similarly immaterial is evidence that Scagliotti made a financial contribution to Sarsfield's campaign for re-election. (*See* Marder Decl, ¶ 2, Ex. 39 (Scagliotti Depo., 30:25-31:7)). Plaintiffs emphasize that the money paid for advertising against one of Sarsfield's

opponents.  But there is nothing in the record before the court to indicate that the contribution, apparently made in 2006 – well after Scagliotti left office – had anything to do with the County.

### 3.  Alleged statements by Supervisor Loe

Plaintiff Hernandez attests that Supervisor Loe appeared on television at some point; and, she purports to quote Loe as having said that "'her life had been ruined by these criminals in Plaintiff P. Michael Pekin's office.'"  (*See* Hernandez Decl., ¶ 13, lines 11-14).  According to plaintiffs, these sentiments are indicative of a County policy of encouraging or coercing the district attorney to file retaliatory lawsuits against political opponents or critics.

The statement, however, is hearsay; and, based on the record presented, the court concludes that no exception applies.  The County's evidentiary objection as to this portion of Hernandez's declaration is therefore sustained.  FED.R.EVID. 802.  Even if the statement was to be considered, however, it is not proof of a County policy or custom of coercing the district attorney to file retaliatory prosecutions against political critics or opponents.  Indeed, plaintiffs have presented no evidence to suggest that the sentiments allegedly, and individually, expressed by Loe properly may be attributable to the County.  *See Lake Nacimiento Ranch Co.*, 841 F.2d at 879; *see also* CAL. GOVT. CODE § 25005.

### 4.  Alleged conduct by County Counsel Biddle

Plaintiffs contend that a County policy of retaliation may be inferred from a settlement offer, made by County Counsel Charles Biddle in or about late May or early June 2005.  Biddle reportedly offered to arrange for the dismissal of the Sarsfield-filed prosecutions against plaintiffs if they agreed to dismiss the Monteon Action.  (*See* Michael Pekin Decl., ¶ 23; Hernandez Decl., ¶ 15).  The court concludes that this testimony qualifies as a party admission (Fed.R.Evid. 801(d)(2)).  The County's evidentiary objections to this portion of plaintiffs' testimony is therefore overruled.

Even so, the fact that a settlement offer was made does not raise a triable issue as to whether the County had a policy of encouraging or coercing Sarsfield to prosecute plaintiffs.  All it proves is that the County was willing to drop its legal actions if plaintiffs dropped theirs.  It does not show that Sarsfield's prosecutions were filed in retaliation for the Monteon Action.

1    Nor does it show that Biddle had any hand in encouraging, coercing or otherwise causing

2    Sarsfield to prosecute plaintiffs.  In fact, there is no apparent dispute that Biddle was not

3    retained as Interim County Counsel until sometime in mid-2005 – that is, after Sarsfield filed

4    the civil and criminal actions in question.  (*See* Hernandez Decl., ¶ 15; *see also* Churchill Reply

5    Decl. ¶14, Ex. 71 (Mar. 22, 2005 Minutes, Item No. 32 at p. 7)).

6         In sum, even viewing the evidence in the light most favorable to plaintiffs, plaintiffs

7    have not raised a genuine issue of material fact as to whether the County caused Sarsfield to

8    prosecute plaintiffs.

9              **5.       Other Alleged Retaliatory Prosecutions by Sarsfield**

10        Plaintiffs nonetheless argue that a policy is evidenced by similarly meritless retaliatory

11   prosecutions filed by Sarsfield against others.

12        Municipal liability may be based upon "the existence of a widespread practice that . . . is

13   so permanent and well settled as to constitute a 'custom or usage' with the force of law."

14   *Gillette*, 979 F.2d at 1349 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

15   Such a policy may be evidenced by a pattern of similar acts or incidents.  *Id*.  Proof of random

16   acts or isolated incidents, however, are insufficient to establish custom.  *Trevino v. Gates*, 99

17   F.3d 911, 918 (9th Cir. 1996); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir.

18   1989).  "When one must resort to inference, conjecture and speculation to explain events, the

19   challenged practice is not of sufficient duration, frequency and consistency to constitute an

20   actionable policy or custom."  *Trevino*, 99 F.3d at 920.

21        Here, plaintiffs point to two declarations by individuals who believe that they (or others

22   that they know) were the targets of meritless criminal prosecutions because they publicly

23   criticized or opposed then-County supervisors Scagliotti and Cruz.

24        First, criminal defense attorney John O'Brien, who served as the County's district

25   attorney from 1958 to 1964, attests that one of his clients, Maria Araujo, was charged by

26   Sarsfield with voting twice in a 2004 Board of Supervisors election – purportedly because she

27   publicly supported Jaime De La Cruz, a political opponent of incumbent Supervisor Cruz.

28   (O'Brien Decl., ¶¶ 3-4).  However, O'Brien's declaration indicates that Araujo *did* vote twice,

14

albeit the charges were dismissed after the incident was found to be "an honest mistake." (*Id.*, ¶ 5). Thus, there apparently was some colorable basis for the charge, and Araujo's prosecution is not proof of a County policy of encouraging or coercing Sarsfield to bring meritless retaliatory prosecutions against political opponents. O'Brien says that it is his "belief" that Araujo was prosecuted in retaliation for her political activities and that the criminal charges were engineered by various (unnamed) individuals interested in the election. (*See id.*, ¶ 6). But that is not an assertion of fact, and there is no foundation for it. FED.R.EVID. 602. In any event, O'Brien's speculative conclusions and personal beliefs, without more, are not sufficient to raise a triable issue as to the existence of a policy. *See Trevino*, 99 F.3d at 920.

Next, Ignacio Velazquez claims that he, too, was the target of meritless criminal charges by Sarsfield in retaliation for his work as a Campaign Manager for De La Cruz, who, as noted above, ran against incumbent Supervisor Cruz. According to Velazquez, initial election results indicated that Cruz won the election; but the final count showed that De La Cruz won by ten votes. (Velazquez Decl., ¶¶ 5-6). Velazquez claims that Cruz then (falsely) accused him of election fraud and made the allegations to the media, the sheriff's office, local police and the district attorney. (*Id.*, ¶ 8). Velazquez further asserts that the Board of Supervisors funded $20,000 to investigate him and that Sarsfield then began an investigation and convened a grand jury (to which Velazquez was summoned in May 2004). (*Id.*, ¶¶ 9-11). However, Velazquez says that Sarsfield later cancelled these proceedings, reportedly because of a potential conflict of interest. (*Id.* ¶ 12).

The record before the court indicates that, in March 2004, the Board of Supervisors allocated $20,000 to the district attorney's office for investigation of alleged election irregularities. (Churchill Reply Decl. ¶20, Ex. 77, p.4 Item 19(b)). Nonetheless, Velazquez's testimony does not prove that the criminal investigation of him was grounded in any policy of retaliation attributable to the County. All it shows is that the district attorney investigated allegations of fraud, made by an unsuccessful candidate, in what apparently was a very close election. Velazquez claims that he was told by the district attorney's office that Scagliotti called an assembly member to have the California Attorney General investigate the election and

15

1  bring criminal charges against Velazquez. (*Id.* ¶ 7). However, this testimony lacks foundation

2  and is hearsay (and no exception applies). FED.R.EVID. 602, 802. At any rate, Velazquez

3  himself testifies that no criminal charges were ever brought by Sarsfield or anyone else; and,

4  there have been no further attempts to initiate criminal proceedings against him. (Velazquez

5  Decl., ¶ 12).

6      In sum, even viewing the evidence in the light most favorable to plaintiffs, the court

7  concludes that no reasonable juror could find that these two declarations evidence a County

8  policy of encouraging, coercing or otherwise causing the district attorney to file meritless

9  retaliatory prosecutions against political opponents of certain members of the Board of

10  Supervisors.

11  **D.      County Board of Supervisors**

12      Plaintiffs argue that the County may be held liable because the County Board of

13  Supervisors ("Board") regularly made budgetary decisions which, they contend, were designed

14  to fiscally reward or pressure Sarsfield to prosecute those who opposed its members. They

15  further assert that the County may be liable because the Board failed to prosecute Scagliotti for

16  alleged violation of the Political Reform Act. The County maintains that plaintiffs' claims are

17  not borne out by the evidence.

18      **1.      Board's Budgetary Decisions**

19          **a.      Payments for Services of Outside Counsel**

20      First, plaintiffs argue that the Board essentially controlled the conduct of (and actively

21  supported) Sarsfield's prosecutions against them by choosing to pay outside private counsel

22  (i.e., Nancy Battel[3] and Phillip Feldman), to assist Sarsfield in the civil and criminal

23  prosecutions in question. To support this contention, plaintiffs point to the following:

24      •      a County Counsel memorandum which, plaintiffs argue, establishes that the

25              Board has the authority to control the hiring of outside counsel by elected

26              department heads (*see* Michael Pekin Decl. ¶ 15, Ex. 37);

27  _____

28      [3]      The parties and documents refer to this individual variously as "Nancy
Miller" and "Nancy Battel." However, there is no apparent dispute that these names refer to
the same person; and, the discrepancy is immaterial to the resolution of the instant motion.

16

- various invoices indicating that the County paid Battel for services rendered in connection with the legal proceedings against plaintiffs (*see id.*, Ex. 36); and

- the declaration of Harry Damkar (Sarsfield's predecessor), who attests that, to the best of his recollection, during his tenure as the County's district attorney from 1983 to January 2003, outside counsel was retained to assist in a criminal prosecution on only one occasion in a homicide. (*See* Damkar Decl. ISO Plaintiffs' Opp. ¶¶ 1-4).

According to plaintiffs, all of this is significant because it demonstrates that the Board made "extraordinary efforts" to prosecute them.

Under California law, the Board does, by a majority of the supervisors, have policymaking authority for the County. *See* CAL. GOVT. CODE § 25005 ("A majority of the members of the board constitute a quorum for the transaction of business. No act of the board shall be valid or binding unless a majority of all the members concur therein."). The Board's authority includes supervision of the appropriation of County funds. *See* CAL. GOVT. CODE § 25303. Nevertheless, it has no power "to affect the independent and constitutionally and statutorily designated investigative and prosecutorial functions of the . . . district attorney of a county." *Id.* Moreover, the Board is statutorily precluded from "obstruct[ing] the investigative and prosecutorial function of the district attorney of a county." *Id.*; *see also Pitts v. County of Kern*, 17 Cal.4th 340, 358, 70 Cal. Rptr.2d 823, 835, 949 P.2d 920, 932-33 (1998) ("A county district attorney prosecuting a criminal action within a county, acts as a *state* officer, exercising ultimately power which may not be abridged by a county board of supervisors.").

The evidence presented by plaintiffs does not raise a genuine issue of material fact as to municipal liability based on an alleged Board custom of using (or abusing) its fiscal powers to pressure the district attorney to file retaliatory prosecutions. To begin, plaintiffs have not properly authenticated the invoices (Exhibit 36) or the County Counsel memorandum (Exhibit 37), and the County's evidentiary objections are sustained. *See* FED.R.EVID. 901, 902.

Even if these evidentiary issues were put aside, however, plaintiffs fail to establish any causal link between any action by the Board with respect to outside counsel and any policy of

retaliation or any deprivation of their constitutional rights. Contrary to plaintiffs' contention, the County memorandum upon which they rely (Michael Pekin Decl. ¶15, Ex. 37) does not establish that the Board directed or controlled the hiring of outside counsel to assist Sarsfield in his prosecution of plaintiffs. Rather, the memo addresses the Board's authority to "direct and control the conduct of litigation in which the county, or any public entity of which the board is the governing body, *is a party . . ..*" CAL. GOVT. CODE § 25203 (emphasis added). That decidedly is not the case as to the allegedly retaliatory prosecutions at issue here, which were brought by Sarsfield on behalf of the state in his capacity as a state officer. Moreover, evidence submitted by the County indicates that (a) Sarsfield, not the Board, made the decision to hire additional attorney staff; and (b) he requested that additional attorneys be hired to assist his office with its workload generally, and not specifically for the purpose of assisting in the prosecution of plaintiffs. (*See* Severian Decl. ¶31, Ex. 9 (Sarsfield Testimony at 76:16-20, 77:11-78:1, 78:13-79:3)).

The other evidence presented by plaintiffs is no more helpful to their case. The fact that the Board dispersed funds to pay Battel and Feldman for their services does not raise a material issue for trial as to the existence of a County policy of encouraging or coercing retaliatory prosecutions by the district attorney. There is no evidence that the Board was even aware that Sarsfield intended to prosecute plaintiffs beforehand. In fact, the County's uncontroverted evidence indicates that (a) in any given fiscal year, the proposed budget for the district attorney's office (as with all County departments) is submitted to the Board in the spring immediately preceding the fiscal year for which funds are requested; (b) the Board prospectively funded Sarsfield's fiscal year 2003-2004 budget without knowing what prosecutions Sarsfield would bring or that Battel's and Feldman's services would be retained; and (c) the County did not begin receiving bills for their services until after the actions had been filed. (*See* Inman Decl. ¶¶7-9, Exs. 10-12; Gonzalez Decl., ¶¶ 5-6, 10; Valencia Decl., ¶ 16; Thompson Decl., ¶¶ 3-5; *see also* Severian Decl. ¶¶4, 7, 8, Exs. 17, 29 and 33). Plaintiffs have presented no evidence to suggest that the Board controlled or influenced the district attorney's personnel decisions or the manner in which his office's budget was spent as to the prosecutions

in question. Indeed, "a county board of supervisors is not authorized to govern the actions of a sheriff or district attorney concerning the manner in which their respective budget allotments are expended or the manner in which personnel are assigned." 77 Ops. Cal. Atty. Gen. 82 (1994), 1994 WL 162946 at p. 5.

Somewhat relatedly, plaintiffs argue that the County may be held liable by virtue of the fact that Battel forwarded to Sarsfield a blind copy of a November 30, 2004 letter she wrote to Michael Pekin in connection with the Monteon Action. (*See* Michael Pekin Decl. ¶15, Ex. 38). The letter in question indicates that Battel was working on behalf of the County in that action. It appears to be a standard "meet-and-confer" letter, typically exchanged in litigation, over the routine subject of scheduling of depositions. In that letter, Battel indicates that, instead of discussing matters pertaining to the Monteon Action, Pekin alluded to allegations about Sarsfield and also made certain allegations about the conduct of others which, he reportedly claimed, "'amount[ed] to a felony.'" (*See id*.). Rejecting Pekin's proposal to delay depositions he had noticed in the Monteon Action, Battel suggested that if Pekin had concerns about felony activity, then he should report them to the district attorney. Further, she expressed her concern over certain unsigned declarations Pekin filed that she claimed were false. (*See id*.).

Nothing in this letter is indicative of a County policy of encouraging Sarsfield to file allegedly retaliatory prosecutions. Indeed, it seems entirely reasonable that Battel would send a copy of the letter to Sarsfield, who was responsible for prosecuting felonies, to apprise him of the conversation. In any event, proof of random acts or isolated incidents are insufficient to establish custom. S*ee Trevino*, 99 F.3d at 918; *Thompson*, 885 F.2d at 1444. Extrapolating a big conspiracy from this single instance requires too great a leap. *See Trevino*, 99 F.3d at 920 ("When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom."). At any rate, plaintiffs have failed to show that Battel's actions are attributable to the County. The County cannot be held liable for Battel's actions on a respondeat superior theory. *See Monell*, 463 U.S. at 691. Nor is there any indication that Battel was a County official with final policymaking authority, or that the County ratified any

1    unconstitutional action on her part.  Indeed, plaintiffs acknowledge that she sent the letter to

2    Sarsfield "on her own initiative" and "without being requested to do so by the District

3    Attorney."  (*See* Severian Decl. ¶23, Ex. 6 (Second Amended Complaint at ¶ 19)).

4        Viewing the evidence in the light most favorable to plaintiffs, no reasonable juror could

5    find a County policy of encouraging or coercing the district attorney to bring retaliatory

6    prosecutions based on the Board's budgetary decisions with respect to Battel and Feldman.

7              **b.      District Attorney's Budget and Salary**

8        Plaintiffs next contend that the Board used its budgetary powers to encourage, coerce or

9    otherwise influence the district attorney to file retaliatory prosecutions against political

10   opponents.  Here, they have presented:

11       •      the declaration of former County supervisor, Richard Place, who opines that the

12              salary and budget of Sarsfield's predecessor, Harry Damkar, was kept

13              "artificially low" in order to pressure Damkar to file retaliatory actions against

14              Scagliotti's and Cruz's political opponents (*see* Place Decl., ¶ 5); and

15       •      purported copies of the County's final budgets for the fiscal years 2001-2005

16              (*See* Marder Decl. ¶3, Exs. 48-51).

17       Plaintiffs' evidence does not raise a genuine issue of material fact as to whether the

18   Board used its budgetary powers to fiscally reward or coerce the district attorney to bring

19   retaliatory prosecutions against political opponents of Board members.  First, Place's assertion

20   that Damkar's budget and salary were kept "artificially low" in order to coerce him to file

21   retaliatory prosecutions against political opponents is speculative and lacks foundation.  *See*

22   FED.R.EVID. 602.

23       At any rate, the evidence submitted by the County indicates that, far from being kept

24   "artificially low," Damkar's salary increased concurrently and commensurately with increases

25   given to other department heads; and, in 1999, Damkar's salary was higher than that paid to

26   district attorneys in five of seven other counties.  (*See* Gonzalez Reply Decl. ¶¶ 3-4, Exs. 61 and

27   66; Churchill Reply Decl. ¶3, Ex. 58; Thompson Decl.¶¶ 7-10, Exs. 81-84).  Moreover, Damkar

28   himself attests that (a) it was never his understanding that there was any relation between his

                                          20

salary and budget and the cases he chose to prosecute; and (b) homicide cases were the only prosecutions that directly impacted his office's budget because they entailed extraordinary costs that could not be anticipated in the routine budget process. (*See* Damkar Decl., ISO County's Reply at ¶¶ 4-5).

Plaintiffs have not properly authenticated the purported County budgets (Exhibits 48-51). *See* FED.R.EVID. 901, 902. Nevertheless, there is no dispute that the district attorney's salary and budget have increased over time. Even so, plaintiffs have not presented any evidence raising a triable issue as to whether those increases correlate at all to Sarsfield's prosecutions against them. The County contends that those increases were based upon the County's general consideration of the salaries of all elected officials. Indeed, it has presented Board minutes, resolutions, memoranda and transmittals which show that the district attorney's salary, including Sarsfield's, has increased at the same time and in proportion to the salary of other department heads. (*See* Churchill Reply Decl. ¶¶ 4-7, 10-19, Ex. 59 at p. 5, Ex. 60 at pp. 14-15, Exs. 62-63, Ex. 67 at p. 8, Exs. 68-70, Ex. 71 at p. 2, Exs. 72-74, Ex. 75 at p. 3, and Ex. 76). Plaintiffs have not presented evidence to the contrary.

Indeed, to the extent the Board concerned itself with the District Attorney's budget, the evidence of record cuts against plaintiffs' theory. Joe Paul Gonzalez, the County Clerk-Auditor-Recorder, attests that, in March 2006, he learned that Sarsfield's department had so far exceeded its budget for the professional services line item that "the entire amount of funding budgeted to Mr. Sarsfield's department for the services and supplies object level had been exceeded." (Gonzalez Decl., ¶ 11). The Board subsequently imposed budgetary controls on Sarsfield's office, questioned his decision to prosecute Los Valientes, publicly censured him, took a vote of "no confidence" and requested an investigation by the California Attorney General as to Sarsfield's expenditure of public funds. (*See* Gonzalez Decl. ¶¶ 12-16; Churchill Decl. ¶3, Ex. 26 at pp. 5-8).

Thus, even viewing the evidence in the light most favorable to plaintiffs, no reasonable fact finder could conclude that Sarsfield's decision to prosecute plaintiffs was affected by or tied in any way to his salary and budget or that the Board's budgetary decisions with respect to

1   the District Attorney's Office was part of any policy to encourage or coerce retaliatory

2   prosecution of political opponents.

3   **2.      Other Allegedly Retaliatory Budget Decisions**

4        Plaintiffs nonetheless maintain that a policy is evidenced by other instances where the

5   Board allegedly used its budgetary powers to punish political opponents of the Board.  Here,

6   they point to the declaration of County Marshal, Robbie Scattini, who asserts that the Board

7   used (or abused) its fiscal powers to punish political opponents of Scagliotti.  In particular,

8   Scattini says that, after his son spoke out against Scagliotti in or about 2003, the Board cut

9   Scattini's budget and, in effect, downsized his staff by transferring his deputy, Martin Defee, to

10  the Sheriff's Department.  (Scattini Decl., ¶ 3-4).

11       Scattini asserts that these decisions were made at the direction of Scagliotti and Cruz in

12  a crusade "to eliminate [his] Office."  (*Id.* ¶ 4).  But these assertions are speculative and lack

13  foundation.  FED.R.EVID. 602.  Scattini further asserts that Scagliotti reportedly said, "I want to

14  put the Marshal outside the courthouse under a tree with a desk."  (*Id.*).  However, there being

15  no indication as to when or how this statement allegedly was made, the court does not find that

16  it qualifies as party admission under Fed.R.Evid. 801(d)(2).  The statement is hearsay, and

17  based on the record presented, no exception applies.  FED.R.EVID. 802.  More to the point, even

18  if the testimony were considered, Scattini's testimony is not evidence that the County had a

19  policy of encouraging or coercing the district attorney to bring retaliatory lawsuits against

20  political opponents of the Board.

21       At any rate, the County has presented documents, apparently authored by Scattini, which

22  indicate that the budget and personnel decisions about which he now complains were the result

23  of his own recommendations.  In particular, the documents show that (a) the Deputy Marshal's

24  position was funded through reimbursement from the courts for bailiff duties, but the

25  reimbursement was not sufficient to fund the Deputy Marshal's full salary; (b) the Marshal's

26  Office and the Sheriff's Department were invited to submit proposals, and the Sheriff's

27  Department submitted a lower bid for court bailiff functions; (c) the bailiff function was then

28  transferred from Scattini's office to the Sheriff's Department, resulting in reduced funding for

22

Scattini's office and the elimination of the Deputy Marshal position; and (d) Scattini recommended that Defee's position as Deputy Marshal be eliminated. (*See* Churchill Reply Decl.¶¶ 21-23, Exs. 78-80). At oral argument, plaintiffs claimed that Scattini had no say in the matter and did not agree with those decisions. They have, however, presented no evidence corroborating those assertions.

In sum, plaintiffs have not raised a triable issue as to whether the County had a policy of encouraging or coercing the district attorney (fiscally or otherwise) to file retaliatory prosecutions against political opponents.

### 3. Alleged failure to prosecute Scagliotti

Plaintiffs apparently maintain that a County policy is evidenced by the Board's failure to prosecute Scagliotti for alleged violation of the Political Reform Act ("Act"). It is not clear how this is relevant to the alleged policy at issue here – i.e., whether the County had a policy of causing the district attorney to bring retaliatory prosecutions against political opponents. In any event, municipal liability does not attach unless the decisionmaker has final policymaking authority to establish municipal policy with respect to the action ordered. *See Gilette*, 979 F.2d at 1349 (citing *Pembaur*, 475 U.S. at 481-82). Here, the Board does not have the final authority to determine whether a prosecution for violation of the Political Reform Act will be brought. *See* Cal. Govt. Code § 91007. Nor have plaintiffs presented any evidence as to what violations (if any) occurred, much less that that Board was aware of them but turned a blind eye. Plaintiffs have not raise a triable fact issue here.

### E. Alleged Corruption Within the County's Planning Department

Plaintiffs contend that a County policy of encouraging the district attorney to bring retaliatory prosecutions against political opponents of certain Board members may be inferred from evidence of alleged corruption within the County's Planning Department. Here, they present various declarations and documents to show that there was a practice within the Planning Department to favor Scagliotti's friends and punish his enemies:

- Patrick Pekin generally avers that the Planning Department would routinely take adverse action against political foes of Scagliotti in order to stifle their efforts to exercise their constitutional rights. (Patrick Pekin Decl., ¶ 3, lines 8-13);

- Richard Place, former County Supervisor from 1997 to 2001, asserts that code enforcement action would be taken (or permits would be denied) as to Scagliotti's critics (Place Decl., ¶ 3);

- Jim Stevens, County Building Inspector, testified (in a separate lawsuit) that those who criticized the County were treated more harshly than those who did not (Marder Decl. ¶4, Ex. 52);

- Denny Madigan, former County Planning Commissioner from January 2003 to September 2003, asserts that critics of the Board would be subject to "harsh code enforcement," whereas those favored by the Board would receive "preferential treatment." (Madigan Decl., ¶ 4). Madigan concluded that the Planning Department denied permit applications from David Grimsley in retaliation for Grimsley's criticism of Scagliotti. (*Id*. ¶¶ 2-3). Madigan believes that he was terminated from his position at the Planning Department because he investigated his concerns about corruption within the department. (*Id*. ¶ 4).

- Sally Reed (a consultant reportedly retained by the County to investigate practices within the Planning Department) allegedly sent an email to Martin Dodd (an out-of-county lawyer reportedly hired by the County to investigate the Planning Department), in which Reed concludes that there was a practice within the Planning Department to reward friends and punish enemies of Scagliotti. (Marder Decl. ¶ 5, Exs. 53-55; Michael Pekin Decl. ¶ 15, Ex. 56).

The assertions of Patrick Pekin and Place are speculative and lack foundation. FED.R.EVID. 602. Moreover, there is little information as to the context or relevance of Stevens' testimony, which apparently was offered in connection with an entirely separate and unrelated lawsuit. Madigan's general assertions as to favoritism shown to Board supporters and his supposition as to the reasons for his termination are speculative and lack foundation.

FED.R.EVID. 602. As for the purported Reed contracts (Marder Decl., Exs. 53-55) and email (Michael Pekin Decl., Ex. 56), plaintiffs have not properly authenticated these documents. FED.R.EVID. 901. Additionally, the statements within the email are also hearsay; and based on the record presented, the court cannot conclude that any exception applies. FED.R.EVID. 802

These evidentiary issues aside, the relevance and probative value of these declarations and documents is questionable. As noted above, a municipal policy may be evidenced by a pattern of similar acts or incidents. *See Gillette*, 979 F.2d at 1349 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Here, plaintiffs' evidence tends to show that there was political favoritism and questionable practices within the Planning Department. But that is not probative of the existence of the alleged policy at issue here – that is, a custom or practice of coercing or encouraging the district attorney to retaliate against political opponents of the Board. Moreover, it is true that the existence of a custom or informal policy may be established by evidence of repeated constitutional violations for which errant municipal officials were not reprimanded, *see Gillette*, 979 F.2d at 1348. However, plaintiffs' evidence also shows that, far from condoning the alleged corrupt practices within the Planning Department, the County made efforts to investigate and eradicate the problem. (*See* Marder Decl.¶5, Exs. 53-55; Michael Pekin Decl. ¶25, Ex. 56).

Viewing the evidence in the light most favorable to plaintiffs, the record falls short of establishing a "persistent and widespread" practice that constitutes "permanent and well settled" County policy.

**F.      Alleged Bullying by Scagliotti**

Plaintiffs nevertheless contend that Scagliotti was, in effect, a political bully who created an atmosphere of fear and intimidation in the County:

- Former Supervisor Richard Place generally avers that other Board members were intimated by Scagliotti and Cruz and would therefore vote in their favor. He also attests that Board member Rita Bolling feared that she would be voted out of office if she opposed Scagliotti or Cruz (Place Decl., ¶ 3, lines 5-12);

- Former Planning Commissioner Denny Madigan asserts that he observed Scagliotti, Kesler, Loe and Cruz work together to protect one another's interests and that they would bully department heads to carry out retaliatory acts against political opponents (Madigan Decl., ¶¶ 5-6); and

- County Marshal Robbie Scattini claims that Scagliotti "would frequently communicate to me that he could use his public office to retaliate against his enemies." (Scattini Decl., ¶ 5).

However, plaintiffs have presented no evidence corroborating the speculative assertions of Place and Madigan. FED.R.EVID. 602. As for Scattini's testimony about the statement purportedly made by Scagliotti – inasmuch as there is no indication as to when or how this statement was made, the court does not find that it qualifies as a party admission under Fed.R.Evid. 801(d)(2). It is hearsay and no exception applies. FED.R.EVID. 802.

In any event, all this testimony shows is that Scagliotti may have operated by intimidating political foes. But he does not have final policymaking authority for the County. *See Lake Nacimiento Ranch Co.,* 841 F.2d at 879; *see also* CAL. GOVT. CODE § 25005. His conduct alone therefore cannot be attributed to the County. Moreover, there is no evidence that the County ordered or ratified actions which Scagliotti may have instigated or undertook on his own initiative. Viewing the evidence in the light most favorable to plaintiffs, the court finds that no reasonable factfinder could conclude that he (or anyone else) was acting pursuant to a County policy of encouraging or forcing the district attorney to prosecute political foes.

**G.      Conspiracy Claim, 42 U.S.C. § 1985(3)**

There being no genuine issue of material fact as to the existence of a County policy as to the acts complained of, there also is no basis for plaintiffs' conspiracy claim.

## IV.  CONCLUSION

The issue here is not whether Scagliotti used his influence to punish his "enemies" and reward his friends. The issue is not whether Sarsfield viewed the plaintiffs as annoying political gadflies and sued them in retaliation for their efforts with Los Valientes. The issue is not whether Scagliotti and Sarsfield may have been in cahoots to "get" the plaintiffs. All these

1    propositions, even if they could be proven, miss the point.  The only defendant here is the

2    County of San Benito.  The only issue squarely before the court on this motion is whether the

3    plaintiffs have offered evidence that would support a reasonable jury finding that the County

4    had a policy of causing lawsuits to be brought as retaliation against people it wanted to punish

5    for speaking out.  Was there that evidence?  There is no potential for *Monell* liability without it.

6         Despite the volume of the proffered, so-called "evidence", the "policy" plaintiffs seek to

7    demonstrate is a house of cards.  It relies on innuendo and speculation and just plain leaps of

8    faith.  It is a potpourri of random, unrelated events and assertions from which plaintiffs strain

9    reason to extrapolate into a policy.  The evidence which gets the closest to being on point lacks

10   foundation or is hearsay.  In short, plaintiffs have not linked Sarsfield's decisions to bring

11   lawsuits against one or more of the plaintiffs with a policy of the County to retaliate against

12   people whom Scagliotti deemed to be enemies.

13                              **V.  ORDER**

14        Based on the foregoing, IT IS ORDERED THAT the County's motion for summary

15   judgment is GRANTED.

16   Dated:   February 15, 2008

17   _____

18   HOWARD R. LLOYD
     UNITED STATES MAGISTRATE JUDGE

27

# ADDENDUM: DEFENDANT'S EVIDENTIARY OBJECTIONS

1.  Plaintiffs' Exhibit 35:            Sustained.  Fed.R.Evid. 901

2.  Plaintiffs' Exhibit 36:            Sustained.  Fed.R.Evid. 901, 902

3.  Plaintiffs' Exhibit 37:            Sustained.  Fed.R.Evid. 901, 902

4.  Plaintiffs' Exhibit 48:            Sustained.  Fed.R.Evid. 901, 902

5.  Plaintiffs' Exhibit 49:            Sustained.  Fed.R.Evid. 901, 902

6.  Plaintiffs' Exhibit 50             Sustained.  Fed.R.Evid. 901, 902

6.  Plaintiffs' Exhibit 51:            Sustained.  Fed.R.Evid. 901, 902

8.  Plaintiffs' Exhibit 53:            Sustained.  Fed.R.Evid. 901, 902

9.  Plaintiffs' Exhibit 54:            Sustained.  Fed.R.Evid. 901, 902

10. Plaintiffs' Exhibit 55:            Sustained.  Fed.R.Evid. 901, 902

11. Plaintiffs' Exhibit 56:            Sustained.  Fed.R.Evid. 802, 901

12. Michael Pekin Decl. ¶ 2, p. 2:3-8       Sustained.  Fed.R.Evid. 602

13. Michael Pekin Decl., ¶ 23, p. 10:3-7:   Overruled.  Fed.R.Evid. 801(d)(2)

14. Hernandez Decl., ¶ 13, p. 5:11-13:      Sustained.  Fed.R.Evid. 802

15. Hernandez Decl., ¶16, p. 6:2-10:        Overruled.  Fed.R.Evid. 801(d)(2)

16. Patrick Pekin Decl., ¶ 3, p. 2:7-13:    Sustained.  Fed.R.Evid. 602

17. Place Decl., ¶ 3:                  Sustained.  Fed.R.Evid. 602

18. Place Decl., ¶ 4:                  Sustained.  Fed.R.Evid. 602

19. Place Decl., ¶ 5:                  Sustained.  Fed.R.Evid. 602

20. Madigan Decl., ¶ 2, p. 2:1-7:      Sustained.  Fed.R.Evid. 602

21. Madigan Decl., ¶ 4, p. 3:1-2:      Sustained.  Fed.R.Evid. 602

22. Madigan Decl., ¶ 6, p. 3:7-16:     Sustained.  Fed.R.Evid. 602

23. O'Brien Decl., ¶ 6:                Sustained.  Fed.R.Evid. 602

24. Scattini Decl., ¶ 4:               Sustained.  Fed.R.Evid. 602

25. Scattini Decl., ¶ 5, p. 2:10-21:   Sustained.  Fed.R.Evid. 802

26. Velazquez Decl., ¶ 7:              Sustained.  Fed.R.Evid. 602, 802

27. Marder Decl., ¶ 3:                 Sustained.  Fed.R.Evid. 901, 902

28.     Marder Decl., ¶ 5:                    Sustained.  Fed.R.Evid. 901, 902

1    **5:05-cv-5402 Notice will be electronically mailed to:**

2    William L Marder bill@polarislawgroup.com

3    Michael C. Serverian mserverian@rllss.com

4    **Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28